**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4272-17T2
      A-4275-17T2

NEW JERSEY PHYSICIANS
UNITED RECIPROCAL EXCHANGE,

  Plaintiff-Appellant,

v.

VASILIOS VIKATOS and
AERI KIM VIKATOS,

  Defendants-Respondents.

_____

VASILIOS VIKATOS and
AERI KIM VIKATOS,

  Plaintiffs-Respondents,

v.

HACKENSACK UNIVERSITY
MEDICAL CENTER, AMY GORE, M.D.,
ATUHANI BURNETT, M.D., GARIMA
DOSI, M.D., GALE LEVY, M.D., and
JONATHAN JOSSE, M.D.,

  Defendants,

and

PETER KAGAN, M.D. and
JOSEPH MANNO, M.D.,[1]

      Defendants-Respondents.

_____

NEW JERSEY PHYSICIANS
UNITED RECIPROCAL EXCHANGE,

      Intervenor-Appellant.

_____

Argued April 29, 2019 – Decided May 21, 2019

Before Judges Fasciale, Gooden Brown and Rose.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-0066-18 and Bergen County, Docket No. L-9345-14.

Thomas Kane argued the cause for appellant (Epstein Becker & Green, PC, attorneys; Anthony Argiropoulos, of counsel and on the briefs; William Gibson, on the briefs).

Paul A. O'Connor, III, argued the cause for respondents Vasilios Vikatos and Aeri Kim Vikatos (O'Connor, Parsons, Lane & Noble, LLC, attorneys; Paul A. O'Connor, III, of counsel; Alexandra Loprete, on the brief).

PER CURIAM

_____

[1] Improperly pled as Joseph Mano, M.D.

A-4272-17T2

In these consolidated actions, New Jersey Physicians United Reciprocal Exchange (NJ PURE) appeals from Law Division orders entered in two vicinages: (1) an April 10, 2018 order upholding a "high-low" agreement between NJ PURE's insured and his patient in the underlying medical negligence action filed in Bergen County (A-4275-17)[2]; and (2) an April 24, 2018 order dismissing NJ PURE's declaratory judgment action filed in Mercer County, seeking a determination that the agreement was not final (A-4272-17). For the reasons that follow, we affirm both orders.

I.

We commence our review with a discussion of well-settled legal principles to give context to the trial judges' decisions and the validity of the high-low agreement at issue.

"Public policy favors the settlement of disputes." Willingboro Mall, Ltd. v. 240/242 Franklin Ave., LLC, 215 N.J. 242, 253 (2013). Among its other benefits, "[s]ettlement spares the parties the risk of an adverse outcome and the time and expense—both monetary and emotional—of protracted litigation. . . . [and] also preserves precious and overstretched judicial resources." Id. at 253-

---

[2] NJ PURE was not named as a party in the medical negligence action; we granted NJ PURE's motion to intervene in A-4275-17.

54 (citation omitted).  In furtherance of the strong policy of enforcing settlements, "our courts strain to give effect to the terms of a settlement wherever possible." Brundage v. Estate of Carambio, 195 N.J. 575, 601 (2008) (internal quotation marks omitted).

Accordingly, an agreement to settle a lawsuit will be honored and enforced in the absence of fraud or other compelling circumstances. Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983).  "[T]he party seeking to set aside the settlement agreement has the burden of proving . . . [an] extraordinary circumstance sufficient to vitiate the agreement[,]" Jennings v. Reed, 381 N.J. Super. 217, 227 (App. Div. 2005), by clear and convincing evidence.  Smith v. Fireworks by Girone, Inc., 380 N.J. Super. 273, 291 (App. Div. 2005).

"A high-low agreement is a device used in negligence cases in which a defendant agrees to pay plaintiff a minimum recovery in return for plaintiff's agreement to accept a maximum sum regardless of the outcome of the trial." Benz v. Pires, 269 N.J. Super. 574, 578 (App. Div. 1994); see also R. 4:24A (defining a high-low agreement and setting forth the requirements of disclosure

to the court and other parties).[3]  The parties also agree to accept any outcome between these limits.  Benz, 269 N.J. Super. at 578-79.  "A high-low agreement protects a plaintiff from the danger of receiving less than the floor amount and protects a defendant from exposure to a judgment higher than the agreed ceiling."  Id. at 579.

Nonetheless, a high-low agreement is a contract subject to traditional rules of contract interpretation.  Malick v. Seaview Lincoln Mercury, 398 N.J. Super. 182, 186 (App. Div. 2008); see also Shafer v. Cronk, 220 N.J. Super. 518, 521-22 (Law Div. 1987) (high-low agreements are treated as settlements).

The "court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose."  Sachau v. Sachau, 206 N.J. 1, 5-6 (2011) (internal quotation marks omitted).  "To the extent that there is any ambiguity in the expression of the terms of a settlement agreement, a hearing may be necessary to discern the intent of the parties at the time the agreement was entered and to implement that intent."  Quinn v. Quinn, 225 N.J. 34, 45 (2016) (citing Pacifico v. Pacifico, 190 N.J. 258, 267 (2007)).  Not every factual dispute

---

[3]  Rule 4:24A was adopted effective September 2018, after the trial judges entered the orders at issue in these appeals.

on a motion requires a plenary hearing; a plenary hearing is only necessary to resolve a genuine issue of a material fact. See e.g., Eaton v. Grau, 368 N.J. Super. 215, 222 (App. Div. 2004).

We review a trial court's decision to enforce a settlement for abuse of discretion. Brundage, 195 N.J. at 613; Chattin v. Cape May Greene, Inc., 216 N.J. Super. 618, 626 (App. Div. 1987). However, our review of a trial court's interpretation of an agreement is de novo. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cantone Research, Inc., 427 N.J. Super. 45, 57 (App. Div. 2012); see also Kieffer v. Best Buy, 205 N.J. 213, 222 (2011) (recognizing the interpretation of a contract is ordinarily a legal question for the court, which is subject to de novo appellate review). The reviewing court must evaluate the common intention of the parties and the purpose they tried to achieve. See Tessmar v. Grosner, 23 N.J. 193, 201 (1957).

## II.

Applying those legal standards here, we turn to the pertinent facts and procedural history that form the focal point of these appeals.

In October 2014, Vasilios Vikatos filed a complaint in the Law Division of Bergen County alleging medical negligence against Hackensack University Medical Center (HUMC), Dr. Peter Kagan, Dr. Joseph Manno, and other

A-4272-17T2

physicians.[4]   As their malpractice carrier, NJ PURE provided a defense and indemnification for Drs. Kagan and Manno.

Prior to trial, Judge Lisa Perez Friscia, in her assignment as the civil settlement judge of the Bergen Vicinage, held four pretrial settlement conferences with counsel between September 26, 2017 and the adjourned trial date of December 4, 2017.  Pertinent to these appeals, after jury selection had commenced before another judge but prior to opening statements, Vikatos' counsel received the following correspondence, signed by NJ PURE's claims manager, on December 4, 2017 (emphasis added):

> This will confirm that you've rejected NJ PURE's previous HIGH-LOW settlement offer on behalf of Dr. Kagan comprised of a HIGH (maximum) of $1,200,000 and a guaranteed LOW (minimum) of $350,000 and conditional [sic] upon releasing Dr. Manno from this lawsuit.  At this time, NJ PURE hereby extends an <u>unconditional</u> HIGH-LOW settlement offer on behalf of Dr. Kagan, comprised of a HIGH (maximum) of $1,350,000 and a guaranteed LOW (minimum) of

---

[4]  According to NJ PURE's merits brief, Vikatos settled his claims against Amy Gore, M.D., Atuhani Burnett, M.D., Garim Dosi, M.D., and Gale Levy, M.D. "prior to the return of the jury verdict[,]" and those physicians are not parties to these appeals.  Vikatos settled his claims with HUMC prior to trial and the medical center is not a party to these appeals.  Further, the complaint alleged a per quod claim by Aeri Kim Vikatos, as the wife of Vasilios Vikatos.  Because her claims are derivative in nature, we refer to Vasilios Vikatos and Aeri Kim Vikatos collectively as "Vikatos" in this opinion.

$350,000. As you know, these parameters reflect what you had previous [sic] demanded during the last settlement conference on 09.26.17 before Judge Perez[]Friscia.

If this offer meets with your approval, please so indicate below.

Vikatos accepted that offer through his attorney, who signed and returned NJ PURE's December 4 correspondence on the same day it was received.

However, following opening statements on December 6, 2017, Vikatos' counsel received an unsigned letter from NJ PURE's claims manager stating, in pertinent part:

> Via letter dated December 4, 2017, NJ PURE offered a [h]igh-[l]ow as to Dr. Kagan consisting of a [l]ow of $350,000 and a [h]igh of $1,350,000, which you accepted by countersigning our letter on the same date.
>
> Other than the damages parameters of the [h]igh-[l]ow, it is NJ PURE's position that the parties did not agree on any other terms and conditions of the [h]igh-[l]ow. As you are no doubt aware, due to the nature of [h]igh-[l]ow agreements, there are various details and conditions that must be negotiated prior to the beginning of trial. Indeed, you have already acknowledged that there are issues that need to be addressed through express agreement, such as what would occur in the event of a mistrial or a hung jury. One such condition, which is the basis of our present dispute, is whether the parties agree to waive the right to appeal an adverse verdict. NJ PURE is not aware of any authority stating that it is customary to waive the right to an appeal merely by agreeing to the damages

parameters of a [h]igh-[l]ow in the absence of an express agreement to do so. To be clear, at no time did NJ PURE expressly indicate, in writing or otherwise, that it intended to waive its right to an appeal by offering a [h]igh-[l]ow to your client in connection with this matter.

In this matter, NJ PURE has always considered preserving its right to an appeal as a non-negotiable condition of its [h]igh-[l]ow offer. We firmly believe that preserving the right to appeal during the course of the trial is necessary to protect not just the interests of Dr. Kagan, but of all parties, by ensuring that the trial is conducted in a fair, honest, and orderly manner in accordance with the N[ew] J[ersey] Court Rules and N[ew] J[ersey] Rules of Evidence.

To the extent you understood that NJ PURE intended to waive its right to appeal by virtue of offering a [h]igh-[l]ow – which seems questionable due to the fact that the parties proceeded to negotiate this and various other conditions – NJ PURE is compelled to take the position that there was never a meeting of the minds at the time you countersigned the December 4, 2017 offer letter and that there is no [h]igh-[l]ow agreement in effect between the parties.

Notwithstanding the above, NJ PURE is still willing to enter a [h]igh-[l]ow consisting of a [l]ow of $350,000 and a [h]igh of $1,350,000 with the express understanding that both parties preserve their right to appeal an adverse verdict. We believe this [h]igh-[l]ow represents a reasonable compromise . . . .

We hope that you will seriously consider our offer and are open to discussing it further with you at your convenience. . . . If this offer meets with your approval, please indicate below.

Finally, please be advised that NJ PURE reserves the right to withdraw the [h]igh-[l]ow settlement offer at any time.

At the conclusion of summations on December 14, 2017, NJ PURE forwarded a final letter to Vikatos' counsel:

NJ PURE remains firm in its position that there was never a meeting of the minds between the parties at the time you countersigned the December 4, 2017 offer letter and that there is currently no [h]igh-[l]ow agreement in effect between the parties.

Furthermore, as you are aware, NJ PURE claims personnel have been present in the courtroom throughout this trial. Based upon their evaluation of the conduct of the trial and the evidence presented, . . . NJ PURE believes the likelihood of a defense verdict is high. In light of the above, the purpose of this letter is to inform you that NJ PURE is hereby withdrawing its [h]igh-[l]ow offer as stated in our December 6, 2017 letter, which has not been accepted to date, consisting of a [l]ow of $350,000 and a [h]igh of $1,350,000 including the express understanding that both parties preserve their right to appeal an adverse verdict.

Later that day, the jury returned a "no cause" verdict in favor of Drs. Kagan and Manno, finding neither doctor was liable for the injuries alleged by Vikatos.

Thereafter, Vikatos filed a motion to enforce settlement in the Bergen Vicinage. NJ PURE opposed the motion on procedural and substantive grounds. Among other things, NJ PURE claimed as a non-party it was "deprived of the

opportunity for formal participation, representation, discovery, or an evidentiary hearing." However, "[t]o ensure NJ PURE's ability to appropriately respond, the court carried the . . . motion to provide NJ PURE further time[,]" and apparently permitted NJ PURE to file a sur-reply without first seeking permission pursuant to Rule 1:6-3(a) (prohibiting the filing of sur-replies "without leave of court").

In support of its position, NJ PURE filed a certification of its claims manager asserting the December 4, 2017 offer letter to Vikatos "was not intended as a final offer of settlement." Rather, the term "'unconditional' was intended only to convey that this settlement discussion—as opposed to prior settlement discussions—would not be conditional [sic] upon the release of Dr. Manno from the [Vikatos] lawsuit." She further stated that the offer letter "did not address a number of important contractual terms," which were noted in her subsequent letters.

Following extensive oral argument, Judge Perez Friscia reserved decision. Thereafter, the judge entered an order. In a comprehensive twenty-four page statement of reasons, which accompanied the order, the judge detailed her reasons for granting Vikatos' motion. Notably, the judge recounted her vivid

11

A-4272-17T2

recollection of pretrial settlement discussions with counsel for the parties (emphasis added):

> As Bergen County settlement judge, the parties' respective firms and NJ PURE have participated in numerous conferences with the court and are familiar with the settlement process. The court in this matter, as in all settlement conference matters, met with all counsel jointly to discuss all material settlement points and options. Th[e] court, thereafter, met separately with counsel for [Vikatos] and defendants. It is recognized that complex medical malpractice cases often take multiple settlement conferences to reach settlement. . . .
>
> Th[e] court, at the first settlement conference [on September 26, 2017] was informed as to the details of each insurance policy and as to each defendant's position with regard to settlement. Th[e] court, thereafter, discussed potential settlement options, including settlement by one or all parties out right, and the possibility of entering into high-low agreements. In discussing the possibility of high-low agreements, th[e] court distinctly and particularly discussed the advantages of a high-low agreement for the parties, as a high-low less[e]ns the risk of the agreed parties and brings the matter to a final conclusion after verdict. . . . Relevantly, waiving appeal provides relief to a defendant doctor in that there is no further exposure to continued litigation or a new trial. If the medical malpractice [action] concludes by way of a no cause verdict, the plaintiff is provided with the agreed low sum of money, and the doctor is not required to report same to the medical practitioners' database, as there was no finding of negligence. As the assigned settlement judge in all medical malpractice matters, recognizing the complexity and specific nuances, the

court goes through all the available settlement options. It is undisputed that this occurred in this case. Th[e] court's recollection is clear. Counsel do not dispute that this court discussed the potential for a high-low agreement with the benefits of protecting the doctors' assets if the verdict were to exceed the policy, protecting the insurance carrier from potential bad faith litigation (as the demands were below each doctor's policy limit), and to protecting the doctors and [Vikatos] from further litigation an [sic] appeal, and, potentially, [the doctors'] reporting requirements. Counsel are seasoned, learned, medical malpractice practitioners and clearly had apparent authority to negotiate through each settlement conference.

The judge squarely addressed the issues raised in view of the applicable legal principles. Initially, she noted NJ PURE's December 4 correspondence referenced the September 26, 2017 conference, during which the judge recalled discussing "the benefits of a high-low" agreement. Importantly, the judge recognized Vikatos' "counsel proceeded to trial with the knowledge that a high-low [agreement] had been reached as to Dr. Kagan. . . . [and] tactically altered [Vikatos'] presentation to the jury because of the understanding there [wa]s a settlement with Dr. Kagan."

Further, the judge determined the terms of NJ PURE's December 4 offer were clearly "unconditional"; devoid of a waiver of appeal; and its "parameters" reflected Vikatos' demands as discussed in the September 26, 2017 settlement conference. The judge further noted, "no attorney [who was present at the

conference] certifie[d] that th[e] court was not very clear as to the term of waiving appeal and that the advantage of a high-low agreement [was] the conclusion of the case for all parties."[5]

In particular, the judge recognized that, if the terms of the December 4, 2017 agreement had been ambiguous, a hearing might have been "necessary to discern the intent of the parties at the time the agreement was entered into and to implement that intent." The judge further acknowledged, generally, when deciding a motion to enforce settlement, a hearing would be required to enable the court to make factual and credibility determinations. Here, however, the judge acknowledged her participation in settlement discussions afforded her the

---

[5] The judge also referenced a certification of Dr. Kagan's counsel, filed by NJ PURE, which stated "after the December 4, 2017 agreement was signed there was a discussion, at [NJ PURE]'s request that the high-low agreement not include a waiver of appeal." (Emphasis added). Three days after oral argument, NJ PURE filed an additional submission, without seeking leave to do so pursuant to Rule 1:6-3, which apparently included another certification of Dr. Kagan's counsel (March 12, 2018 certification). Thereafter, the judge held a telephonic conference with counsel and properly excluded NJ PURE's submission. Nonetheless, NJ PURE impermissibly included the March 12, 2018 certification in its appendix, see Rule 2:6-1, and improperly referenced it in its reply brief on appeal. An issue that is not addressed in a party's initial merits brief is deemed to be waived. See Drinker Biddle & Reath LLP v. N.J. Dept. of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011). Further, because the March 12, 2018 certification was not considered by the trial court, it is inappropriate for our consideration on appeal. See Zaman v. Felton, 219 N.J. 199, 226-27 (2014).

ability to conclude, without a hearing, that "the negotiation of a high-low [agreement] . . . at all times while th[e] court was involved contemplated a waiver of appeal." Accordingly, the judge concluded "based on the negotiations and written agreement, a valid enforceable high-low agreement was entered into between [Vikatos] and Dr. Kagan on December 4, 2017."

While the motion to enforce settlement was pending in Bergen County, NJ PURE filed a declaratory judgment action in Mercer County against Vikatos, seeking a determination that the high-low agreement was not a final, enforceable agreement. NJ PURE contended the motion to enforce the settlement was "procedurally improper because NJ PURE [wa]s not a party to that action, [w]as not . . . served with process in that action, [and w]as not . . . served with the pending [m]otion in that action. . . . " NJ PURE's one-count complaint demanded a jury trial. In response, Vikatos filed a motion to dismiss the complaint in lieu of filing an answer.

Thereafter, in a cogent statement of reasons, incorporating Judge Perez Friscia's written decision, Mercer County Judge R. Brian McLaughlin granted Vikatos' motion. In doing so, the judge determined NJ PURE's declaratory judgment action "clearly involves the same core set of facts as those [asserted] in the motion to enforce settlement in the Bergen action." Accordingly, the

judge barred NJ PURE's action pursuant to the entire controversy doctrine, and dismissed its complaint as moot.

## III.

On appeal, NJ PURE renews the arguments it raised before Judge Perez Friscia, essentially claiming: its due process rights were violated because it was not a party to Vikatos' complaint; the judge improperly acted as a fact witness in lieu of holding a hearing to determine the enforceability of the high-low agreement; and the December 4, 2017 high-low settlement offer did not include material terms, such as the right to appeal and, accordingly, the ensuing "agreement" is unenforceable. NJ PURE further contends Judge McLaughlin erred by relying on Judge Perez Friscia's decision as a basis to dismiss its complaint.

Having reviewed the record, we find no basis to disturb either judge's thoughtful analysis of the issues presented, and affirm substantially for the reasons set forth in their respective statements of reasons. We add only the following comments.

A-4272-17T2

## A.
### (A-4275-17)

The terms of the December 4, 2017 high-low agreement were not ambiguous and were clearly "unconditional." Because the agreement is silent as to the right to appeal, however, we must "look to the expressed intent of the parties and the context of the agreement." Serico v. Rothberg, 234 N.J. 168, 179 (2018).

Here, Judge Perez Friscia detailed her recollection that she "distinctly and particularly discussed" the benefits of a high-low agreement with the parties, including post-verdict finality. The parties "understood and discussed" the nature of a waiver of appeal, particularly if the jury returned a no cause verdict, "which [would be] a non-reportable event to the medical board, and the matter would be concluded and could not be appealed." Notably, no defense counsel or party filed a certification asserting otherwise.

Our Supreme Court decided Serico shortly after Judge Perez Friscia rendered her decision. In that case, the plaintiff sought to recover counsel fees and litigation expenses permitted under Rule 4:58-2, but which were not included in the high-low agreement. Id. at 173. In concluding the plaintiff was

not entitled to those expenses, the Court highlighted the distinction between a

high-low agreement and an offer of judgment:

> An offer of judgment pursuant to Rule 4:58 is designed to encourage parties to settle claims that ought to be settled, saving time, expense, and averting risk, while the specter of the continued prosecution of the lawsuit remains. A high-low agreement, in contrast, only mitigates the risk faced by the litigants—it saves no time or expense related to litigation and requires the full panoply of judicial process, up to and including a jury verdict. Although the high-low agreement is a settlement, it is not the sort of settlement contemplated by Rule 4:58; rather, it serves a different purpose and provides distinct benefits.
>
> . . . .
>
> A crucial aspect of any high-low agreement is finality; both parties benefit from the strict and explicit limitation of financial exposure that such agreements provide.
>
> [Id. at 179-180 (emphasis added).]

Clearly, as Judge Perez Friscia astutely observed, the purpose of the high-low agreement was to provide finality to the parties and avoid reporting requirements[6] where, as here, a no cause verdict was rendered. The high-low offer as written by NJ PURE expressly stated it was "unconditional." The

---

[6] See N.J.S.A. 17:30D-17(a) (requiring an insurer to notify the Medical Practitioner Review Panel "of any medical malpractice claim settlement, judgment or arbitration award . . . .")

implicit waiver of the right to appeal satisfies the parties' intentions, and underscores the "crucial [finality] aspect" of the December 4, 2017 high low agreement. Id. at 180. Accordingly the certification filed by NJ PURE's claims manager does not dispel the finality of the December 4, 2017 agreement.

Moreover, because we find the terms of the December 4 agreement were unambiguous and the parties did not file certifications disputing the judge's recollection of settlement discussions, NJ PURE's argument that the judge improperly decided the motion without holding a plenary hearing is unavailing. Eaton, 368 N.J. Super. at 222. Indeed, the cases cited by NJ PURE are readily distinguishable from the present matter. See e.g., Dalton v. Barone, 310 N.J. Super. 375, 379, 381 (App. Div. 1998) (remanding for "possible expansion of the record" when the settlement judge could not recall the settlement conference). Unlike the judge in Dalton, Judge Perez Friscia's recollection of the settlement conferences in this matter is undisputed.

Nor did the judge rely on her "private knowledge" of the settlement negotiations in that counsel were also present and participated therein. Contra Wallington Home Owners Ass'n v. Borough of Wallington, 130 N.J. Super. 461, 465 (App. Div.) (criticizing the trial judge for citing his personal opinion that a shopping center would not thrive in the proposed locale), aff'd o.b., 66 N.J. 30

19

(1974); <u>Amadeo v. Amadeo</u>, 64 N.J. Super. 417, 424 (App. Div. 1960) (finding the trial judge improperly relied on "private knowledge" when he simply "guessed" that the husband in a divorce action earned more income than what he reported on his tax return).

B.
(A-4272-17)

The entire controversy doctrine "embodies the principle that the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy." <u>Wadeer v. N.J. Mfrs. Ins. Co.</u>, 220 N.J. 591, 605 (2015). The purposes of the doctrine are "(1) the need for complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." <u>Ibid.</u> (quoting <u>DiTrolio v. Antiles</u>, 142 N.J. 253, 267 (1995)).

"In determining whether a subsequent claim should be barred under [the entire controversy] doctrine, 'the central consideration is whether the claims against the different parties arise from related facts or the same transaction or series of transactions.'" <u>Ibid.</u> (quoting <u>DiTrolio</u>, 142 N.J. at 267). "It is the core

20

set of facts that provides the link between distinct claims against the same parties . . . and triggers the requirement that they be determined in one proceeding." Ibid. (alteration in original) (quoting DiTrolio, 142 N.J. at 267-68). "[T]here is an obvious waste of judicial resources if the second litigation would have been obviated or rendered unnecessary by mandatory joinder." DiTrolio, 142 N.J. at 278.

Here, NJ PURE claims at the time it filed its declaratory judgment action, "there was no other action [then] pending between the same parties on the same issues" apparently because it was not a named party in Vikatos' medical negligence action. However, as Judge Perez Friscia noted in deciding the motion to enforce settlement, as the insurance carrier for Drs. Kagan and Manno, NJ PURE could "participate, negotiate, and enter into a settlement agreement in the underlying action on behalf of a party." Accordingly, it is axiomatic that Vikatos' motion to enforce settlement and NJ PURE's declaratory judgment action arose from the December 4, 2017 high-low settlement. NJ PURE's claims manager was intimately involved in pretrial settlement negotiations; to claim the parties were dissimilar is a distinction without a difference.

To the extent we have not otherwise addressed NJ PURE's remaining arguments, we find they lack sufficient merit to warrant discussion in our written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4272-17T2